Approved: */s/ Daniel M. Tracer*
         DANIEL M. TRACER
         Assistant United States Attorney

Before:   HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

------------------- x
                                :  **SEALED COMPLAINT**
UNITED STATES OF AMERICA        :
                                :  Violations of
            - v. -            :  15 U.S.C. §§ 78j(b) &
                                :  78ff; 17 C.F.R. §
SEAN WYGOVSKY,              :  240.10b-5; 18 U.S.C. §§
                                :  1343 & 2.
       Defendant.       :
                                :  COUNTY OF OFFENSE:
                                :  New York
------------------- x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       THOMAS McDONALD, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Securities Fraud)

    1.  From at least in or about January 2015 through at least in or about April 2021, in the Southern District of New York and elsewhere, SEAN WYGOVSKY, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, WYGOVSKY fraudulently misappropriated confidential information from his employer, a Canadian asset management firm (the "Employer Firm"), about the

Employer Firm's confidential securities trade orders and trading activity, and used that information for his own profit by directly and indirectly placing timely, profitable securities trades based on that information in accounts controlled or directed by WYGOVSKY, including in accounts held by his close relatives.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT TWO
## (Wire Fraud)

2.   From at least in or about January 2015 through at least in or about April 2021, in the Southern District of New York and elsewhere, SEAN WYGOVSKY, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WYGOVSKY, including through the use of interstate and foreign wires, fraudulently misappropriated confidential information from the Employer Firm about the Employer Firm's securities trade orders and trading activity, and used that information for his own profit by directly and indirectly placing timely, profitable securities trades based on that information in accounts controlled or directed by WYGOVSKY, including in accounts held by his close relatives.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.   I have been a Special Agent with the FBI for approximately thirteen years.  I am currently assigned to a squad that is responsible for investigating violations of the federal securities laws, as well as wire and mail fraud laws and related offenses.  I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for committing such offenses.

4.   The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly and indirectly, from other sources,

including documents provided by others, and from speaking with representatives of the United States Securities and Exchange Commission (the "SEC"). Because this affidavit is being submitted for a limited purpose, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part unless otherwise noted. Where dates, figures, and calculations are set forth herein, they are approximate.

## Overview of the Scheme

5. At all times relevant to this Complaint, SEAN WYGOVSKY, the defendant, resided in or around Toronto, Canada, and was employed as a securities analyst and trader at the Employer Firm. The Employer Firm is an asset management firm based in Toronto, Canada with at least approximately $19 billion in assets under management. WYGOVSKY has worked at the Employer Firm since at least in or about 2013, and prior to that, WYGOVSKY worked for other employers in the securities industry, including in New York, New York.

6. As further described below, since at least in or about 2015, SEAN WYGOVSKY, the defendant, has engaged in a front running scheme whereby WYGOVSKY has been committing insider trading through the misappropriation of confidential, material, non-public information about the securities trade orders of the Employer Firm. WYGOVSKY misappropriated this information in order to engage directly and indirectly in short-term personal securities trading designed to make millions of dollars in profits by executing trades that take advantage of relatively small price movements in a company's stock that follow from large securities orders executed on behalf of the Employer Firm (the "Front Running Scheme"). In order to hide his engagement in the Front Running Scheme, WYGOVSKY has engaged in this illicit personal trading in brokerage accounts held in the name of WYGOVSKY's close relatives.

7. Based on my training and experience, large asset management firms, like the Employer Firm, require their employees to keep information about, among other things, their securities trade orders and executions strictly confidential and have prohibitions and safeguards designed to prevent their employees from using that information for any purpose outside the scope of their employment, including prohibitions concerning confidentiality, personal trading, and insider trading. In particular, according to one of the Employer Firm's March 19, 2021 filings with the SEC, the Employer Firm represented (i) that it

3

maintains a Code of Ethics that includes, among other things, "general requirements that [the Employer Firm's] supervised persons comply with their fiduciary obligations to clients and applicable securities laws, and specific requirements relating to, personal trading, insider trading, conflicts of interest and confidentiality of client information;" (ii) that employees of the Employer Firm's must "comply with personal trading restrictions and report their personal securities transactions and holdings to [the Employer Firm's] Chief Compliance Officer"; and (iii) that, subject to certain exceptions, the Employer Firms' employees are prohibited from certain trading activity, including, among other things, "[t]hey generally may not invest in the same securities that [the Employer Firm] purchases, sells or is considering for the Funds."

## The Fraudulent Scheme

### The Illicit Front Running Trading

8.      As part of my investigation, I have reviewed trading records as well as an analysis of trading records conducted by the SEC (the "Trading Analysis").  The Trading Analysis focuses on five brokerage accounts (the "Subject Accounts") maintained by three close relatives of SEAN WYGOVSKY, the defendant ("Relative-1," "Relative-2," and "Relative-3").  In particular, one of the Subject Accounts was maintained by Relative-1.  At all times relevant to this Complaint, Relative-1 lived in or around Louisberg, North Carolina.  The other four Subject Accounts were maintained by Relative-2 and Relative-3, who are married to each other.  At all times relevant to this Complaint, Relative-2 and Relative-3 lived in or around Clifton, Virginia.  For at least one of the Subject Accounts maintained by Relative-2 and Relative-3, WYGOVSKY is listed as beneficiary of the account in the event of the death of the accountholder.

9.      Based on my review of the trading records and the Trading Analysis, I have learned that since at least in or about 2015, the Subject Accounts have generated millions of dollars in profits and that a substantial portion of those profits are attributable to the Front Running Scheme.  In particular, I have observed a repeated pattern of short-term intraday trading in the Subject Accounts as follows: (i) one of the Subject Account buys (or short sells[1]) shares in a public company; (ii) minutes later, the

---

[1] Short selling is a method of trading designed to benefit from the decrease in the price of a stock whereby a trader borrows

4

Employer Firm begins executing purchases (or sales) of shares in that same company in quantities that are far larger than the amount of shares bought (or short sold) by the Subject Account. This trading by the Employer Firm leads to a slight, temporary movement in the price of the relevant company's stock during the window that the Employer Firm is executing its trades (the "Window"); namely, the stock price will tend to rise slightly if the Employer Firm is buying (consistent with the increased demand hitting the market), and the stock price will tend to drop slightly if the Employer Firm is selling (consistent with the increased supply hitting the market); (iii) during the Window, the relevant Subject Account then liquidates its position by selling (or buying to cover the short) shares in the company at the temporary inflated (or deflated) price created by the pressure of the Employer Firm's executions.

   a.   By way of example, on or about September 10, 2019, one of the Subject Accounts purchased approximately 30,000 shares of stock in a public company called Now Inc. ("DNOW"), whose stock trades on the New York Stock Exchange, between approximately 10:33 and 10:45 am. Then, beginning at approximately 10:55 am, the Employer Firm began executing an order to buy approximately 173,000 shares of DNOW. That order was executed over the next approximately five hours on September 10, 2019, and, during that time, caused DNOW's share price to increase slightly. While those purchases by the Employer were being executed, the Subject Account that had purchased 30,000 shares of NDOW sold all 30,000 shares at approximately 11:38 am for approximately $4,500 in profits.

   b.   By way of further example, on or about March 19, 2020, one of the Subject Accounts short sold approximately 25,000 shares of stock in a public company called Merit Medical Systems, Inc. ("MMSI"), whose stock trades on the NASDAQ, between approximately 10:52 and 11:03 am. Then, beginning at approximately 11:12 am, the Employer Firm began executing an order to sell approximately 131,591 shares of MMSI. That order was executed over the next approximately four hours on March 19, 2020, and, during that time, caused MMSI's share price to decrease slightly. While those sales by the Employer Firm were being executed, the Subject Account that had short sold 25,000 shares of MMSI purchased 25,000 shares (i.e., enough to cover its short position) at approximately 12:12 pm for approximately $27,450 in profits.

---

shares to sell in the market while agreeing to subsequently purchase shares to repay or "cover" the loan.

5

          c.    The Trading Analysis is ongoing, but to date, has revealed over 700 specific instances of trading in this pattern since in or about 2015, yielding a total of over $3.6 million in trading profits.[2]

      10.    As part of my investigation, I have also reviewed records from brokerage firms that were involved in executing trades on behalf of the Employer Firm. Brokerage records from at least one of these brokerage firms based in New York, New York (the "Broker") included the log-in information and IP address of the Employer Firm trader who was conducting the trading on behalf of the Employer Firm. In particular, records from the Broker include the log-in "swygovsky" for a substantial number of trades by the Employer Firm in 2019 and 2020, including many instances where "swygovsky" was the only trader from the Employer Firm logged into the Broker's trading system. These log-ins include dozens of instances where the time of the Employer Firm trading by "swygovsky" coincides with examples of the Front Running Scheme trading in the Subject Accounts described above.

          a.    By way of example, on or about November 10, 2020, between approximately 9:56 and 10:04 a.m., one of the Subject Accounts bought approximately 40,000 shares of Carparts.Com Inc ("PRTS") for an average price of approximately $9.70 per share. Then between approximatey 10:05 and 10:26 a.m., the Employer Firm purchased approximately 210,844 shares in PRTS for an average purchase price of $9.77 per share. On November 10, 2020, "swygovsky" was the only trader from the Employer Firm logged into the Broker's trading system and made various trade orders throughout the morning. Between approximately 10:12 and 11:19 a.m., the Subject Account that had purchased the PRTS shares that morning, sold those shares at an average price of $9.81 per share. This trading in PRTS by the relevant Subject Account resulted in at least approximately $4,300 in profits.

      11.    Based on my review of the trading records and the Trading Analysis, including IP logs that show the location of the account user, I have learned that SEAN WYGOVSKY, the defendant, engaged in a substantial portion of the personal trading in the Subject Accounts as part of the Front Running Scheme. For example, from in or about January 2015 through in or about February 2018, most of the trading comprising the Front Running Scheme was conducted

---

[2] The Subject Accounts also include other profitable trading activity, including some activity that does not involve same day purchases and sales of securities, and some trading activity that does not overlap with trading by the Employer Firm.

in one of the Subject Accounts belonging to Relative-2 and Relative-3 ("Account-1"). During that time, some of the log-ins to Account-1 and to the trading systemn of the Broker, which was executing trades on behalf of the Employer Firm, were conducted from the same Canadian IP address. Furthermore, despite the fact that Relative-2 and Relative-3 lived in Virginia, the overwhelming majority of the log-ins to Account-1 during the period were from Canada, where WYGOVSKY lives. Moreover, some of the IP addresses used to log into Account-1 were also used for log ins to a personal brokerage account belonging to WYGOVSKY.[3] In addition, IP address log-ins also show that the majority of the relevant trading in the Subject Account belonging to Relative-1 ("Account-2"), which was concentrated in and around 2020, was also conducted from locations in Canada.

        a. At times, the IP log-ins from the Subject Accounts show that the location of the relevant trading also occurred in other places that coincide with locations where WYGOVSKY was travelling. For example, travel records show that between in or about June and August of 2020, WYGOVSKY travelled to a Caribbean island (the "Caribbean Island"). Trading records show that the relevant trading in Account-2 during that period was conducted from the vicinity of the Caribbean Island. Similarly, travel records show that WYGOVSKY traveled to Nantucket, Massachusetts in or about August of 2020. Trading records show that the relevant trading in Account-2 during that period was conducted from Nantucket.

<u>Financial Transfers back to WYGOVSKY</u>

    12. Based on my review of financial records, I have also learned that Relative-2 and Relative-3 sent money to SEAN WYGOVSKY, the defendant, and his family, including proceeds of the Front Running Scheme, during the operation of the Front Running Scheme. In particular, Relative-2 and Relative-3 maintain at least one bank account at HSBC (the "Bank Account"). At all times relevant to this Complaint, the Bank Account was funded almost entirely by funds from the Subject Accounts, including millions of dollars in deposits from profits of the trading activity described above. From my review of the Bank Account, I have learned that between approximately 2015 and 2020, Relative-2 and Relative-3 have moved at least approximately $2.8 million from the Bank Account to

---

[3] Beginning in the Fall of 2018, the majority of the relevant trading in Account-1 as well as other Subject Accounts was conducted from IP addresses associated with the United States, often with locations in or around Virginia.

7

another account they control. Relative-2 and Relative-3 then wrote checks from this second account to WYGOVSKY and other family members of his totalling at least approximately $660,000. Similarly, in or about December 2020, Relative-2 and Relative-3 sent approximately $22,000 to a bank account controlled by WYGOVSKY as a "gift." I have also learned that between in or about November 2017 and January 2018, Relative-2 and Relative-3 transferred approximately $224,000 to a Slovenian bank. Information associated with the transfers show that they were sent to individuals with a specific last name (the same last name as WYGOVSKY's wife), and that they were denoted as a "gift."

WHEREFORE, I respectfully request that an arrest warrant be issued for SEAN WYGOVSKY, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

s/Thomas McDonald, by the Court, with permission
_____
THOMAS McDONALD
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to me through the transmission
of this Complaint by reliable electronic means
pursuant to Federal Rule of Criminal Procedure 4.1,
this 1st day of July, 2021

_____
HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK